IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

GLINDA LANE,

       Plaintiff,

v.                                            CASE NO. 1:09-cv-00159-MP-AK

MICHAEL J. ASTRUE,

       Defendant.

_____/

# O R D E R

This action is brought pursuant to 42 U.S.C. § 405(g) of the Social Security Act

(Act) for review of a final determination of the Commissioner of Social Security (Commissioner)

denying Plaintiff's applications for disability insurance benefits (DIB) and supplemental security

income benefits (SSI) filed under Titles II and XVI of the Act.

Upon review of the record, the Court concludes that the findings of fact and

determinations of the Commissioner are not supported by substantial evidence and the decision

of the Commissioner is reversed and remanded.

## A.      PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on January 7, 2004, initially alleging a

disability onset date of April 15, 2001, because of depression, bipolar disorder, hepatitis C, and

post traumatic stress disorder (PTSD). Plaintiff petitioned for a hearing before an administrative

law judge (ALJ), who conducted a hearing on June 12, 2006, and entered an unfavorable

decision on November 1, 2006. (R.16). At the hearing, Plaintiff amended her disability onset

date to January 7, 2004. (R. 717-718). The Appeals Council denied Plaintiff's request for

review, thus making the decision of the ALJ the final decision of the Commissioner.  This action

followed.

**B.      FINDINGS OF THE ALJ**

The ALJ found that Plaintiff had the following severe impairments: hepatitis C; a history

of anemia; bipolar disorder; anxiety disorder; and alcohol addiction disorder, in remission, but

that these impairments, singly or in combination, did not meet the listing requirements.  While

the ALJ found Plaintiff to have medically determinable impairments that could reasonably cause

Plaintiff's alleged symptoms, he did not find the intensity, duration, and limiting effects reported

by Plaintiff to be entirely credible.  Specifically, the ALJ noted that "there is no evidence of an

impairment, or combination of impairment[s] the severity of what has lasted for a continuous

period of not less than 12 months."  (R. 19).  The ALJ determined that Plaintiff is not physically

impaired.  The state agency physician reported that Plaintiff can "lift/carry at least 20 pounds,

occasionally, 10 pounds frequently, and [] stand, walk, or sit for about 6 hours each in an 8-hour

workday."  (R. 20).  The ALJ noted that the state agency physician's assessment was consistent

with light work exertion.  With respect to Plaintiff's mental ability, a state agency psychologist

reported that Plaintiff has only "mild to moderate functional limitations."  (R. 20).  The ALJ

noted that Plaintiff has "contributed negatively to her general state of health by her lifestyle of

alcohol abuse."  (R. 20).  The ALJ concluded that Plaintiff's mental impairments are treatable so

long as Plaintiff complies with the prescribed treatment and medication regimens.  Thus, based

on the medical reports and the nature of Plaintiff's work as an office manager, receptionist,

telephone interviewer, and cashier, the ALJ found that Plaintiff was capable of performing her

past relevant work during the time period at issue.  Furthermore, the ALJ found that Plaintiff's

substance abuse disorder was a contributing factor material to the determination of disability.

## C.   ISSUES PRESENTED

Plaintiff argues that the ALJ erred by finding that the severity of Plaintiff's impairments did not last for a continuous period of twelve months.  Plaintiff contends that the ALJ erred by not seeking testimony from a vocational expert regarding the impact of her mental impairments upon her ability to work.  She further argues that the ALJ did not properly analyze her substance abuse disorder.  Specifically, Plaintiff contends that the ALJ's decision included inconsistent statements as to whether or not her substance abuse disorder was a contributing factor material to the determination of disability.

The government responds that the ALJ properly assessed the severity of Plaintiff's impairments, including giving Plaintiff "the benefit of the doubt" by continuing his analysis through step four of the sequential evaluation process.  The government contends that the ALJ had no duty to request testimony from a vocational expert.  The government further argues that the ALJ's misstatement of the law regarding Plaintiff's substance abuse disorder did not prejudice Plaintiff.  Finally, the government contends that substantial evidence supports the ALJ's determination that Plaintiff was not disabled.

The issue thus presented is whether the Commissioner's decision that Plaintiff is not disabled is supported by substantial evidence in the record and decided by proper legal standards.

## D.   STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) sets forth the standard of review for this court.  The Commissioner's decision must be affirmed if it is supported by substantial evidence and the

correct legal standards have been applied.  Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir.

1997).  Findings of fact by the Commissioner which are supported by substantial evidence are

conclusive. 42 U.S.C. § 405(g).  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996).

"Substantial evidence" has been defined to mean "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  Foote v. Chater, 67 F.3d 1553, 1560 (11th

Cir. 1995) (citation omitted) (per curiam).  It is more than a scintilla, but less than a

preponderance.  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations

omitted).  The court may not reweigh the evidence or substitute its judgment for that of the

Commissioner.  Wolfe v. Chater, 86 F.3d 1072, 1076 (11th Cir. 1996).  It must determine only if

substantial evidence supports the findings of the Commissioner.  See Bridges v. Bowen, 815

F.2d 622, 624 (11th Cir. 1987) (per curiam).  Even if substantial evidence exists which is

contrary to the Commissioner's findings, where there is substantially supportive evidence of the

Commissioner's findings, the court cannot overturn them.  Barron v. Sullivan, 924 F.2d 227, 230

(11th Cir. 1991).  Unlike the deferential review accorded to the Commissioner's findings of fact,

his conclusions of law are not presumed valid. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th

Cir. 1990) (citations omitted).  The Commissioner's failure to apply correct legal standards or to

provide the reviewing court with an adequate basis for it to determine whether proper legal

principles have been observed requires reversal.  Id. (citations omitted).

A disability is defined as an "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or

mental impairment must be so severe that claimant is not only unable to do his previous work,

"but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in five steps:

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairment?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent any other work?

A finding of disability or no disability at any step renders further evaluation unnecessary.

Plaintiff bears the burden of establishing a severe impairment that keeps him from performing

his past work.  If Plaintiff establishes that his impairment keeps him from his past work, the

burden shifts to the Commissioner at step five to show the existence of other jobs in the national

economy which, given Plaintiff's impairments, Plaintiff can perform.  Chester v. Bowen, 792

F.2d 129, 131 (11th Cir. 1986); MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If

the Commissioner carries this burden, Plaintiff must prove that he cannot perform the work

suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).  It is

within the district court's discretion to affirm, modify, or reverse a Commissioner's final

decision with or without remand. 42 U.S.C. § 405(g); Myers v. Sullivan, 916 F.2d 659, 676 (11th

Cir. 1990).

## E.      SUMMARY OF CLAIMANT'S RELEVANT MEDICAL HISTORY

Because the ALJ's decision is dated November 1, 2006, the relevant medical records concern Plaintiff's condition prior to that time and after the amended onset date of January 7, 2004.

On March 23, 2004, Plaintiff was examined at Shands Healthcare after "a recent diagnosis of hepatitis C." (R. 213). Plaintiff reported chronic fatigue and difficulties sleeping. (R. 213). Plaintiff further reported that she had stopped consuming alcohol eight months before this examination. (R. 214). Examination notes indicate that Plaintiff felt "that she [was] doing well on her current management for depression." (R. 215). Plaintiff granted permission to Shands Healthcare for possible inclusion in a clinic to treat her hepatitis C. (R. 215). Plaintiff had an upper gastrointestinal endoscopy on April 19, 2004 (R. 212); and she underwent a gastric emptying on April 26, 2004. (R. 217).

Dr. Nazario, a consultative physician, examined Plaintiff on March 25, 2004. (R. 225-229). Plaintiff reported that she was receiving treatment for hepatitis C at Shands Clinic. (R. 225). Plaintiff further reported receiving treatment at Meridian for depression " 'on and off since 1992.' " (R. 226). Plaintiff is able to shop for groceries, cook, clean, and attend to her personal hygiene. (R. 226). She reported feeling anxious " 'almost every day.' " (R. 226). Dr. Nazario noted that Plaintiff "demonstrated the ability to concentrate," "was persistent in her approach," had adequate pace, and interacted appropriately with other persons. (R. 228). He diagnosed Plaintiff with alcohol dependence in early remission, post traumatic stress disorder, and bipolar II disorder. (R. 228). Dr. Nazario concluded that Plaintiff seemed capable of managing her own finances. (R. 228). Dr. Nazario examined Plaintiff again on October 14, 2004. (R. 220). Plaintiff reported arthritis in her knees, lower back pain, fatigue, and hepatitis C. (R. 220). Dr.

Nazario confirmed his previous diagnosis, and he noted that Plaintiff appeared "pretty stable." (R. 223).

In a Psychiatric Review Technique form completed on April 6, 2004, Dr. Bee reported that Plaintiff had the following functional limitations: mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no limitations from episodes of decompensation, each of extended duration. (R. 181, 191). In a Mental Residual Functional Capacity Assessment form dated April 6, 2004, Dr. Bee further reported that Plaintiff had moderately limited ability to maintain attention and concentration for extended time, ability to complete a normal work schedule without interruptions from her psychological symptoms, and ability to set realistic goals or make her own plans. (R. 195-198). However, Dr. Bee noted that Plaintiff "appears mentally capable of well structured task activity." (R. 197). Dr. Bee found that Plaintiff's social skills are "appropriate," and her "adaptive skills are adequately developed." (R. 197).

Dr. Chodosh, a consultative physician, examined Plaintiff on April 7, 2004, for allegations of disability secondary to hepatitis C and pain in her knees. (R. 207). Dr. Chodosh reported that Plaintiff was "independent in activities of daily living," but she had "slight difficulty squatting, because of knee pain." (R. 207). Plaintiff's hand function, hearing, and speech were normal; her "vision correct[ed] well"; and she could drive. (R. 207). She could sit, lift, stand, and walk. (R. 207). Physical examination revealed that Plaintiff was moderately obese, but she otherwise appeared healthy. (R. 208). Dr. Chodosh noted that Plaintiff was "fully oriented, ha[d] normal speech pattern, appropriate thought content, and normal affect." (R. 208). Neurological tests revealed that Plaintiff's motor function was "grossly normal" in all four

extremities.  (R. 209).  Plaintiff was diagnosed with moderate obesity; [f]atigue, probably

mutifactorial cause"; "[h]istory of emotional disorders"; "[h]epatitis C, without signs of hepatic

failure or compromise"; and "[m]ild arthritis in knees."  (R. 210).  Dr. Chodosh opined that

Plaintiff was able to see, hear, speak, walk, stand, and sit normally.  (R. 210).  Further, Dr.

Chodosh determined that Plaintiff could stoop, lift, carry, handle light objects, travel, understand

and follow directions, and "squat and kneel occasionally."  (R. 210).

On October 13, 2004, Dr. Chodosh examined Plaintiff for disability secondary to

" '[o]besity, hepatitis C, arthritis, knee pain, anemia, depression, [and] PTSD.' " (R. 200).

Plaintiff also complained of chronic fatigue.  (R. 200).  Dr. Chodosh's findings were similar to

those contained in his reported dated April 7, 2004.  Plaintiff was diagnosed with moderate

obesity; "[f]atigue, probably mutifactorial cause"; "[h]istory of emotional disorders"; "[h]epatitis

C, without signs of hepatic failure or compromise"; and "[m]oderate degenerative joint disease

affecting both knees."  (R. 203).  Dr. Chodosh opined that Plaintiff was "able to see, hear, and

speak normally," and she could "walk and stand to a moderate extent, not very extensively."  (R.

203).  Further, Dr. Chodosh determined that Plaintiff could sit normally, stoop and lift, handle

light objects, travel, understand and follow directions, and "carry light loads occasionally."  (R.

203).  He concluded that Plaintiff was not able to "squat, kneel, or crawl."  (R. 203).

In a Psychiatric Review Technique form completed on October 26, 2004, Dr. Zelenka

reported that Plaintiff had the following functional limitations: mild difficulties in maintaining

concentration, persistence, or pace; and one or two episodes of decompensation, each of

extended duration.  (R. 235, 245).  In a Mental Residual Functional Capacity Assessment form

dated October 26, 2004, Dr. Zelenka further reported that Plaintiff had moderately limited ability

to complete a normal work schedule without interruptions from her psychological symptoms. (R. 248-250). Dr. Zelenka diagnosed bipolar disorder and alcohol depression (in remission), but he concluded that there was "no support for the [diagnosis] of PTSD." (R. 250). He opined that "[g]iven minimal allowances, [Plaintiff] remains capable of carrying out instructions and relating approp[riately] in a routine work setting." (R. 250).

In a Physical Residual Functional Capacity Assessment completed on November 3, 2004, Dr. Bancks reported that Plaintiff had the following exertional limitations: occasionally lifting twenty pounds, frequently lifting ten pounds, standing or walking for about six hours in an eight-hour workday, and sitting for about six hours in an eight-hour workday. (R. 251-258). Dr. Bancks further reported that Plaintiff had postural limitations of occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching, and crawling; and never climbing ladders, ropes, or scaffolds. (R. 253). Finally, Dr. Bancks noted that Plaintiff should avoid concentrated exposure to hazards, fumes, odors, dusts, gases, and poor ventilation. (R. 255).

On May 18, 2005, Plaintiff was examined at Shands at the University of Florida. (R. 295). The Hepatology Outpatient Note indicates that Plaintiff's depression was "much better" since she was taking medication. (R. 295).

Plaintiff was treated by Meridian Behavioral Healthcare, Inc. (Meridian), a mental health center, from June 30, 1997 to May 5, 2006. (R. 296-559). Treatment notes indicate that Plaintiff was admitted to detoxification programs in 2001 and 2003. (R. 396, 457, 464). A Comprehensive Treatment Plan Reassessment form dated November 7, 2003, reported that Plaintiff was transferred from the residential substance abuse program to the dual diagnosis program. (R. 359-360). Treatment notes also indicate that Plaintiff was being treated for "major

depressive disorder." (R. 314, 326, 338).

In a statement dated May 25, 2006, Dr. Linas, a treating psychiatrist affiliated with Meridian, reported that Plaintiff was being treated for bipolar disorder and post traumatic stress disorder. (R. 575). Dr. Linas noted that Plaintiff had not abused drugs or alcohol for two and a half years, and he opined that Plaintiff would have been significantly ill even if she had not been able to obtain drugs or alcohol. (R. 575). Dr. Linas reported that Plaintiff had the following limitations: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration. (R. 576).

## F.   SUMMARY OF THE ADMINISTRATIVE HEARING

At the time of the hearing, Plaintiff was 48 years old. (R. 715). She completed secretarial courses after high school, and she has one year of college education. (R. 715). Plaintiff stated that she has not worked full-time since 2000 or 2002, when she was employed as a receptionist by Children's Medical Center, a physician's office in Alachua, Florida.[1] (R. 715, 733). Plaintiff held that position for approximately six months. (R. 715). Plaintiff also has past relevant work experience as a secretary for the State of Florida, a part-time office worker for Cummings Supply Company, a grocery store employee, and a telephone interviewer for the University of Florida.[2] (R. 716-717). Plaintiff held a position at the Children's Center for

---

[1]Although Plaintiff was uncertain of her dates of employment at the time of the hearing, the record indicates that she worked at Children's Medical Center from February 2003 to July 2003. (R. 122).

[2]In a Work Activity Report, Plaintiff reported that she worked as a cashier for Hitchcock and Sons Inc. from June 2001 to January 2002, a temporary employee for Hillman Supply

Services in Gainesville for three years, and she reported having problems with absenteeism and irritability with clients. (R. 733).

Prior to her examination, Plaintiff's attorney suggested amending the onset date to the date of Plaintiff's disability application, January 7, 2004. (R. 717). She noted that this change would result in a "closed period" of January 2004 to January 2005. (R. 717). The attorney stated that she had informed Plaintiff of this suggestion, and Plaintiff "understands the impact of her work activity during that period of time." (R. 717-718). The attorney further stated that Plaintiff was not working at the time of the hearing. (R. 718). The ALJ agreed to the amended onset date. (R. 718).

Plaintiff testified that she worked with her cousin in a home construction business.[3] (R. 718). She was paid ten dollars an hour. (R. 719). Plaintiff related that her cousin handled some of Plaintiff's job duties. (R. 719). Her performance started to decline about "three or four months into the job. (R. 720). Plaintiff reported that she would leave early or come in late "[j]ust about every day." (R. 720). She had some significant earning periods because she would help with answering the phones when her cousin was on vacation. (R. 720-721). In January 2006, the owner of the business terminated Plaintiff for "getting irritable with customers" and being absent for a week. (R. 721).

---

Company Inc. from approximately February 2001 to April 2001, and as a secretary specialist for the State of Florida from 1999 to March 2001. (R. 111-112). In a Work History Report dated February 29, 2004, Plaintiff reported that she had been working at her then current position as a telephone interviewer for the University of Florida since December 2003. (R. 123).

[3]In a Work Activity Report, Plaintiff reported working with her cousin at Hillman Supply Company Inc. (R. 111).

Plaintiff entered a six-month dual diagnosis program at the end of 2003 for her addiction

and health problems. (R. 722). Plaintiff had previously been admitted to treatment programs,

but not to a dual diagnosis program. (R. 722). Since she was enrolled in the program, Plaintiff

had a three day episode of alcohol and drug use. (R. 722). This episode occurred when Plaintiff

learned that her hepatitis C treatment was not working. (R. 722). Plaintiff sought treatment from

her therapist after this episode. (R. 723).

Plaintiff reported that she is bipolar, and she "get[s] panic attacks and then the depression

sets in." (R. 723). She experiences fatigue from these episodes. (R. 723). Plaintiff testified that

the episodes last "for weeks at a time," and it has been worse since she has not been working.

(R. 723). She gets irritable, and she "snap[s]" at her children and mother. (R. 723). Plaintiff

does not socialize with her mother or children, and she spends most of her time in bed. (R. 723-

724). On a "good day," Plaintiff prepares breakfast for her children, shops for groceries with her

mother, and takes her eldest son to driver's education classes. (R. 724). On a "bad day,"

Plaintiff's mother takes care of her children, and Plaintiff goes to bed or sits in a chair and stares

at the television. (R. 724). When she is depressed, Plaintiff does not attend to her personal

hygiene. (R. 724). Plaintiff's mother encourages Plaintiff to bathe. (R. 724). Plaintiff reported

that she has ten or twelve bad days in a month. (R. 725).

Plaintiff lived by herself when she exited the dual diagnosis program, but that only lasted

six to eight months. (R. 725). She was working for the University of Florida when she lived on

her own. (R. 725). Plaintiff's children lived with her mother at the time. (R. 725). Plaintiff

testified that she had to ride the bus to work, and she would stay in her house for days at a time.

(R. 725). She related that she was not reporting to work as scheduled, and that is when she

terminated her employment with the University of Florida. (R. 725). Plaintiff has lived with her parents since 2004. (R. 725).

Plaintiff's mother manages Plaintiff's finances, paying the bills with the money Plaintiff gives her. (R. 726). Plaintiff does not believe that she can budget to pay her bills "on [a] time line." (R. 726). She had a checking account, but she stated that "was a big joke." (R. 726).

Plaintiff believes she was diagnosed with hepatitis C in December 2001. (R. 726). She took three month's worth of medication, including pills, a weekly injection, and Interferon. (R. 727). Plaintiff's treatment was stopped because she was not responding to it. (R. 727). Plaintiff reported that she experiences fatigue from the hepatitis C, and the doctors are monitoring her liver. (R. 727). She also experiences stomach problems, and she was hospitalized for "severe stomach pains." (R. 728). Plaintiff is not sure if the doctors attributed her stomach pains to hepatitis C or to her gastric bypass. (R. 728). She has not previously had those symptoms with her gastric bypass. (R. 728). The doctor told Plaintiff that he would perform an upper gastrointestinal examination if she had another episode of stomach pains, and then he would proceed with a colonoscopy. (R. 728).

On a good day, Plaintiff is able to complete simple chores, such as washing the dishes or cleaning the kitchen. (R. 728). She does not perform any chores on bad days. (R. 728). Plaintiff goes to the store with her mother, and she is able to sit and watch television. (R. 729).

When she was working with her cousin, Plaintiff was forgetful and irritable. (R. 729). Plaintiff's cousin spoke with her two or three times about her difficulties relating to customers. (R. 729). She also had difficulties communicating with co-workers, and she would "snap" at them for rearranging items on her desk. (R. 729-730). After such incidents, Plaintiff would have

to go outside for a cigarette before returning to work. (R. 730). She said that her problems with co-workers happened "sometimes every day." (R. 730).

With respect to her PTSD, Plaintiff reported that she has "major anxiety attacks and panic attacks" from a childhood incident. (R. 730-731). She still has memories of the incident, and she stated that she does not handle it well. (R. 731). She believes that it could be "part of her aggression." (R. 731).

Plaintiff had physical therapy treatment for pain in her hips, back, and pelvis. (R. 731). She does not have enough Medicaid to continue physical therapy, so she is currently utilizing home treatment methods. (R. 731). She consults the physical therapist occasionally for pain management, and she takes medication. (R. 731). Plaintiff reported that the treatment and medication alleviates her pain, and she would rate her pain as a "4" on a scale of 0 to 10. (R. 731-732). Plaintiff's pain is sometimes irritated by exercise, and she takes Skelaxin as a muscle relaxer and as pain medication. (R. 732).

Plaintiff experiences night sweats, but she is not sure if these stem from her mental health medication. (R. 732). She is taking Seroquel for sedation, and she takes medication in the morning to help her wake up. (R. 732).

## G.   <u>DISCUSSION</u>

### <u>1.  The ALJ erred by finding that Plaintiff's mental impairments did not constitute a nonexertional impairment or last for a continuous period of twelve months.</u>

The ALJ found that the medical evidence supported a finding that Plaintiff could perform her past relevant work; that she did not have nonexertional limitations that significantly interfered with her ability to work; and that her impairments did not last for a continuous period

of twelve months.  Plaintiff's primary treating source was Dr. Jose Linas at Meridian, where she

was seen from June 30, 1997 to May 5, 2006.  Dr. Linas treated her for bipolar disorder and post

traumatic stress disorder.  (R. 575).  Dr. Linas noted that Plaintiff had not abused drugs or

alcohol for two and a half years, and he opined that Plaintiff would have been significantly ill

even if she had not been able to obtain drugs or alcohol.  (R. 575).  Dr. Linas reported that

Plaintiff had the following limitations: marked restriction of activities of daily living; marked

difficulties in maintaining social functioning; marked difficulties in maintaining concentration,

persistence, or pace; and repeated episodes of decompensation, each of extended duration.  (R.

576).

      If a treating physician's opinion on the nature and severity of a claimant's impairments is

well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in the record, the ALJ must give it controlling

weight. 20 C.F.R. § 404.1527(d)(2).  Nevertheless, the ALJ may discount the treating

physician's opinion if good cause exists to do so.  Hillsman v. Bowen, 804 F.2d 1179, 1181

(11th Cir. 1986).  Good cause may be found when the opinion is "not bolstered by the evidence,"

the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and

conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating

physician's] own medical records," the statement "contains no [supporting] clinical data or

information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the

opinion "is not accompanied by objective medical evidence."  Lewis v. Callahan, 125 F.3d 1436,

1440 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) (citing Schnorr

v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).  If an ALJ rejects a treating physician's opinion,

he must give explicit, adequate reasons for so doing, and failure to do so results in the opinion

being deemed accepted as true as a matter of law.  MacGregor v. Bowen, 786 F.2d 1050, 1053

(11th Cir. 1986); Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992).

When discounting Plaintiff's treating source, Dr. Linas at Meridian, the ALJ noted:

> The undersigned has accorded due consideration to the opinion, functional
> assessment and disabling conclusions of a treating psychiatrist.  (Exh. 13F).
> However, after considering this assessment in relation to the rest of the medical
> evidence of record, the undersigned is persuaded that her treating physician's
> more disabling conclusions are the result of an unquestioned acceptance of the
> claimant's subjective complaints.  Despite the claimant's emotional difficulties,
> the medical record contains abundant evidence to the effect that the claimant's
> ailments are treatable, and that these should be responsive to conservative medical
> treatment and care.

(R. 20).

The ALJ does not offer any factual findings to support his suggestion that Dr. Linas, a

medical professional who had treated Plaintiff for *years* prescribing medication and follow-up

treatment, was incompetent or otherwise failed to accurately and adequately assess his patient's

complaints, i.e. accepting her complaints without question.  See Marbury, 957 F.2d at 840-841

(ALJ "may not arbitrarily substitute his own hunch or intuition for the diagnosis of a medical

professional.").  It is an abuse of discretion for an ALJ to disregard the diagnosis of a treating

physician in favor of his own uninformed medical evaluation.  Id. at 840.  While the ALJ can

properly discount the medical diagnoses of a treating physician, he must clearly articulate his

reasons for doing so and have substantial evidence in the record to support his decision.  Id. at

841.  Although the ALJ cited to  "abundant evidence," the evidence he referenced was the

findings of the state agency psychologists who noted only mild to moderate mental functional

limitations and found her capable of working in a normal work setting and functioning

appropriately. The ALJ stated:

> Although the State Agency physicians and psychologists did not examine the claimant, they provided specific reasons for their opinions about the residual functional capacity showing that the opinions were grounded in the evidence in the case record including careful consideration of the claimant's allegations about [her] symptoms and limitations.[4]

(R. 20).

However, the opinion of a non-examining physician *alone* does not constitute substantial evidence to support an ALJ's decision. Swindle v. Sullivan, 914 F.2d 222 (11th Cir. 1990). Further, the opinion of an non-examining physician does not constitute good cause for rejecting the opinion of a treating physician. Johnson v. Barnhart, 138 Fed. Appx. 266 (11th Cir. 2005). Thus, in the present case, substantial evidence must not only support a contrary opinion, but must also support the grounds asserted for discounting the treating physician's opinion, i.e. that Dr. Linas' opinion was based on an unquestioned acceptance of her subjective complaints, and this Court finds that it does not.

Therefore, failing to provide explicit, adequate reasons for not accepting Dr. Linas' opinion, his opinion is accepted as true as a matter of law. See Marbury, 957 F.2d at 841. Thus, the record establishes that Plaintiff has marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration

Although Dr. Linas had treated Plaintiff for years consistently, he did not specifically

---

[4] Actually Dr. Nazario, a consultative examiner, **did** examine Plaintiff and made similar findings, but his opinion is still not afforded the weight of a treating physician. See Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986).

address the continuity of her symptomology and the resulting limitations, and the ALJ found in a conclusory manner that "there is no evidence of an impairment, or combination of impairment, the severity of what has lasted for a continuous period of no less than 12 months."  (R. 19).

The duration requirement is satisfied when the disability "can be expected to result in death or . . . has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A). When analyzing the continuity requirement as it applies to mental impairments, one court stated:

> While the mere existence of symptom-free period may negate a finding of disability when a physical impairment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of the claim. Unlike a physical impairment, it is extremely difficult to predict the course of mental illness. Symptom-free intervals, though sometimes indicative of a remission in the mental disorder, are generally of uncertain duration and marked by an impending possibility of relapse. Realistically, a person with a mental impairment may be unable to engage in competitive employment, as his ability to work may be sporadically interrupted by unforeseeable mental setbacks.

Singletary v. Bowen, 798 F.2d 818, 821 (5th Cir. 1986) (quoting Lebus v. Harris, 526 F.Supp. 56, 61 (N.D. Cal. 1981)).

While the Eleventh Circuit Court of Appeals has not decided this precise issue, other courts that have considered the durational requirement for a mental impairment and have determined that a plaintiff need not show 12 months of impairment without any periods of remission. See, e.g., McGee v. Bowen, 647 F.Supp. 1238, 1251 (N.D. Ill. 1986) (noting that "[e]vidence that a mentally impaired claimant has periods of remission from symptoms is relevant to the severity of the impairment, but does not itself determine how long the impairment is likely to last"); Dreste v. Heckler, 741, F.2d 224, 226 n.2 (8th Cir. 1984); Miller v. Heckler, 747 F.2d 475, 478 (8th Cir. 1984).  "The requirement that an impairment last or be expected to

last for a continuous period of twelve months means only that the impairment must be a 'long term problem and not just a temporary setback.' " <u>McGee</u>, 647 F.Supp. at 1251 (quoting <u>Singletary</u>, 798 F.2d at 822); <u>see</u> 20 C.F.R. § 404.1508.  A mental impairment which "manifests itself from time to time over a long-term period" is consistent with the durational requirement. <u>Singletary</u>, 798 F.2d at 822.

This Court finds the above noted analysis persuasive that the durational requirement for mental impairments should be assessed in such a manner and further finds that the ALJ's decision regarding the durational requirement is not supported by substantial evidence. Plaintiff's mental impairments and their effects are well-documented.  Plaintiff was diagnosed with "anxiety/depression" in 1992. (R. 450). Further, treatment notes from Meridian indicate that Plaintiff was being treated for "major depressive disorder."  (R. 314, 326, 338).  On May 25, 2006, Dr. Linas reported that he had been treating Plaintiff for bipolar disorder and PTSD for two years.  (R. 575).  Dr. Linas further reported that Plaintiff's condition had been "substantially as described" since 2003.  (R. 575).  Thus, Plaintiff has demonstrated a long history of mental impairments and treatment.  Although treatment notes reveal some  improvement over the years, such symptom-free periods do not indicate Plaintiff's failure to meet the durational requirement. <u>See</u>  <u>Singletary</u>, 798 F.2d at 822.  Based on the medical evidence of record, and utilizing the analysis for mental impairments discussed above, there can be no doubt that Plaintiff's mental impairments lasted for a period of twelve continuous months.

Based on the opinion of Dr. Linas, Plaintiff may meet the listing requirements for Listing 12.04 Affective Disorders:

> The required level of severity for these disorders [affective disorders] is

met when the requirements in A and B are satisfied or when the requirements in C are satisfied.

***

    A.3 Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes); AND
    B. Resulting in at least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration OR
    C. Medically documented history of a chronic affective disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
    1. Repeated episodes of decompensation, each of extended duration; or
    2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
    3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Therefore, this Court remands this cause to the Commissioner for a determination of whether Plaintiff meets this listing.

### 2. The ALJ erred by not seeking testimony from a vocational expert.

When an ALJ finds that a person can perform her past relevant work, he is not required to use vocational expert testimony. Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir. 1996); Barrett v. Chater, 38 F.3d 1019, 1024 (8th Cir. 1994). However, this Court finds that the ALJ did not have substantial evidence to support his finding that Plaintiff could perform her past relevant work. In fact, accepting Dr. Linas' opinion as true, Plaintiff had significant nonexertional mental impairments, and a vocational expert must testify when a claimant has a nonexertional

impairment that significantly limits his basic work activities.  <u>Swindle v. Sullivan</u>, 914 F.2d 222,

226 (11th Cir. 1990). Nonexertional limitations affect a person's ability to meet the other

demands of work and include mental limitations, pain limitations, and all physical limitations

that are not included in the seven strength demands.  <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1242,

n.11 (11th Cir. 2004).  Some examples of nonexertional limitations are:

> (i) You have difficulty functioning because you are nervous, anxious or depressed; (ii) You have difficulty maintaining attention or concentrating; (iii) You have difficulty understanding or remembering detailed instructions; (iv) You have difficulty in seeing or hearing; (v) You have difficulty tolerating some physical feature(s) of certain work settings, e.g., you cannot tolerate dust or fumes; or (vi) You have difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching.

20 CFR §404,1569a(c).

According to the records from Meridian and the opinion of Dr. Linas, Plaintiff was

treated for major depressive disorder and had marked difficulties in concentration, persistence

and pace, as well as social functioning, and a vocational expert should be called to assess the

impact of these limitations on her ability to perform work available in the national economy.

Upon remand, if Plaintiff is found not to meet the listing requirements of 12.04, a vocational

expert should be called.

### 3.  The ALJ did not properly analyze Plaintiff's substance abuse disorder.

Plaintiff amended her onset date at the hearing to January 7, 2004, precisely because of

concerns that her previous substance abuse would be a contributing factor to her disability as it

related to her initial onset date.  (R. 717).  In a statement dated May 25, 2006, Dr. Linas noted

that Plaintiff had not abused drugs or alcohol for two and a half years, and in his opinion

Plaintiff was significantly limited by her bipolar and PTSD, even without the involvement of

drugs or alcohol. (R. 575). Treatment notes from Meridian do not reflect complaints about

substance abuse or indicate drug or alcohol treatment after 2004, the focus of her condition after

that point was for bipolar disorder. Inasmuch as the Commissioner concedes that the ALJ

"misstated the law on this issue," (Def. Br. at 8), and in light of this Court's decision to remand,

the issue is moot.

Accordingly, it is

**ORDERED AND ADJUDGED:**

That the decision of the Commissioner denying benefits be **REVERSED AND REMANDED** for further proceedings consistent with this order, including, but not limited to, consideration for payment of benefits under Listing 12.04, or in the alternative, the assessment of a vocational expert as to the affect of her nonexertional impairments on her ability to perform work related activities.

**DONE AND ORDERED** this _28th_ day of July, 2010

*s/Maurice M. Paul*
Maurice M. Paul, Senior District Judge